**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and ARTHUR H. BUNTE, Jr., as Trustee, )))) | |
| *Plaintiffs*, )) | |
| )) | Case No. 18 C 1792 |
| v. )) | District Judge |
| THE RENCO GROUP, INC., ) a New York corporation; ) BLUE TURTLES, INC., ) a New York corporation; ) THE DOE RUN RESOURCES ) CORPORATION, a New York corporation; ) ILSHAR CAPITAL LLC, ) a Delaware limited liability company; ) INTEVA PRODUCTS, LLC, ) a Delaware limited liability company; ) UNARCO MATERIAL HANDLING, INC., ) a Tennessee corporation; and ) US MAGNESIUM LLC, ) a Delaware limited liability company; )) | Magistrate Judge |
| *Defendants.* ) | |

**COMPLAINT**

Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund and Arthur H. Bunte, Jr., one of its present trustees, for a cause of action against Defendants allege as follows:

**INTRODUCTION**

1.      Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund"), and Arthur H. Bunte, Jr., as trustee, have a claim against each of the Defendants, jointly and severally, in the amount of $6,336,967.08 for pension withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001 *et seq.*

2.      The Pension Fund is a non-profit, multiemployer pension plan and trust which is operated in accordance with a trust agreement. The Pension Fund is primarily funded by contributions remitted by multiple participating employers pursuant to collective bargaining agreements negotiated with local unions affiliated with the International Brotherhood of Teamsters (the "IBT") on behalf of employees of those same employers. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Pension Fund and paying the administrative expenses of the Pension Fund.

3.      Congress enacted ERISA in 1974 to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds had been accumulated in them. Congress wanted to guarantee that if a worker had been promised a defined pension benefit upon retirement, he/she would actually receive it upon becoming vested.

4.      To address the debilitating effect that employer withdrawals have on multiemployer plans, Congress passed MPPAA. MPPAA provides that when an employer withdraws from a multiemployer plan, it must pay "withdrawal liability" in an amount roughly equal to its proportionate share of the plan's unfunded vested benefits, which is the difference between the present value of a pension plan's assets and the present value of the benefits it will be obligated to pay in the future. 29 U.S.C. §§ 1381, 1391.

5.    Employers become obligated to pay withdrawal liability only when they "withdraw" from the pension plan - that is, when they completely cease making contributions to the plan on behalf of their employees, or reduce their obligations in such a way as to trigger a "partial" withdrawal. 29 U.S.C. §§ 1383, 1385.

6.    The MPPAA also provides that not only the withdrawn employer, but also all members of its controlled group, are jointly and severally liable for the withdrawal liability. A controlled group is defined as:

> [A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.

29 U.S.C. § 1301(b)(1). That is, all members of a common control group of trades or businesses are *jointly and severally* liable for the withdrawal liability incurred by any one member of the controlled group.

7.    Generally speaking, under 29 U.S.C. § 1301(b)(1) and the regulations thereunder, trades or businesses are under common control where there is parent and subsidiary relationship, or if the same five or fewer persons own at least 80% of both organizations.

8.    During all relevant times, RG Steel Wheeling, LLC ("RG Wheeling") was a contributing employer in the Pension Fund.

9.    On March 1, 2011, The Renco Group, Inc. ("Renco") purchased the ownership interests in RG Wheeling (and other companies as discussed and defined in paragraphs 44-47 below as the RG Controlled Group) in a highly leveraged deal that quickly turned sour. During the remainder of 2011, the RG Controlled Group companies lost hundreds of millions of dollars and were insolvent by the end of 2011.

10.     As the parent company in the RG Controlled Group, Renco was a member of the controlled group with all other trades or businesses in the RG Controlled Group subject to withdrawal liability if a member of the RG Controlled Group that contributed to the Pension Fund ceased operations and/or ceased to have an obligation to contribute to the Pension Fund.

11.     Concerned about this significant potential withdrawal liability, on January 17, 2012, Renco sold a portion of its ownership interest (i.e., 24.5%) in the RG Controlled Group, thus reducing its ownership of the RG Controlled Group companies to 75.5%, which was sufficient to terminate its controlled group relationship with the RG Controlled Group, and which Renco believed shielded it from the potential withdrawal liability of the RG Controlled Group.

12.     Thus, from March 1, 2011 to January 17, 2012, Renco was a trade or business under common control with the RG Controlled Group within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder, and along with the RG Controlled Group was treated as a single employer for purposes of assessing and collecting withdrawal liability.

13.     Then in August 2012, RG Wheeling permanently ceased operations, and as a result, permanently ceased participation in the Pension Fund, thus effecting a complete withdrawal which resulted in it incurring withdrawal liability to the Pension Fund in the principal amount of $6,336,967.08. The Pension Fund has not been able to collect the withdrawal liability from RG Wheeling or any other member of the RG Controlled Group.

14.     29 U.S.C. § 1392(c) provides that if a principal purpose of any transaction is to evade or avoid withdrawal liability, withdrawal liability may nonetheless be determined and collected without regard to the transaction.

15.     A principal purpose of Renco selling a portion of its ownership interest in the RG Controlled Group was to eliminate the common control that existed between Renco and the RG Controlled Group, and thus to evade or avoid the withdrawal liability owed by the RG Controlled Group to the Pension Fund.

16.     Pursuant to 29 U.S.C. § 1392(c), Renco's divestiture of a portion of its ownership interest in RG Wheeling is to be disregarded in determining and collecting withdrawal liability owed by the RG Controlled Group, including Renco.

17.     Therefore, on or about August 25, 2012, and pursuant to 29 U.S.C. § 1392(c), Renco is deemed to have been a trade or business under common control with the RG Controlled Group within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder, and consequently jointly and severally liable for the withdrawal liability.

18.     After the Pension Fund assessed Withdrawal Liability against the RG Controlled Group, upon information and belief, Renco (and the other Defendants as discussed and defined in paragraphs 59-67 below as the Renco Controlled Group) had actual notice of the Withdrawal Liability, and did not challenge the Withdrawal Liability or initiate arbitration pursuant to 29 U.S.C. §§ 1399(b)(2)(A) or 1401(a)(1).

19.     Thus, all of the Defendants are jointly and severally liable to the Pension Fund for the Withdrawal Liability in the principal amount of $6,336,967.08.

## JURISDICTION AND VENUE

20. This action arises under ERISA, as amended by the MPPAA, 29 U.S.C. § 1001 *et seq*. This Court has jurisdiction over this action under 29 U.S.C. §§ 1132(e), 1132(f) and 1451(c), as well as under 28 U.S.C. § 1331.

21. Venue lies in this district under 29 U.S.C. §§ 1132(e)(2) and 1451(d) in that the Pension Fund is administered at its principal place of business in Rosemont, Illinois.

## PARTIES AND RELATIONSHIPS

22. The Pension Fund is a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3).

23. Plaintiff Arthur H. Bunte, Jr., is a present trustee and fiduciary of the Pension Fund within the meaning of 29 U.S.C. § 1002(21)(A), and he and his fellow trustees are the plan sponsor of the Pension Fund within the meaning of 29 U.S.C. § 1301(a)(10). The Trustees administer the Pension Fund at 9377 West Higgins Road, Rosemont, Illinois.

24. Pursuant to 29 U.S.C. §§ 1132(a)(3) and 1451(a)(1), the Trustees, by and through their designated trustee Arthur H. Bunte, Jr., are authorized to bring this action on behalf of the Pension Fund, its participants and beneficiaries for the purpose of collecting withdrawal liability.

25. Defendant Renco is a corporation organized under the laws of the State of New York. Renco is a private company with its principal place of business in the state of New York that owns and operators numerous other companies throughout the United States (and the world) with annual revenues in excess of $5 billion.

26. Defendant Blue Turtles, Inc. ("Blue Turtles") is a corporation organized under the laws of the State of New York.

27. Defendant The Doe Run Resources Corporation ("Doe Run") is a corporation organized under the laws of the State of New York.

28. Defendant Ilshar Capital LLC ("Ilshar") is a limited liability company organized under the laws of the State of Delaware.

29. Defendant Inteva Products, LLC ("Inteva") is a limited liability company organized under the laws of the State of Delaware.

30. Defendant Unarco Material Handling, Inc. ("Unarco") is a corporation organized under the laws of the State of Tennessee.

31. Defendant US Magnesium LLC ("US Magnesium") is a limited liability company organized under the laws of the State of Delaware.

32. RG Steel Holdings LLC ("RG Holdings") is a limited liability company organized under the laws of the State of Delaware.

33. RG Wheeling was a limited liability company organized under the laws of the State of Delaware.

34. WP Steel Venture LLC ("WP Steel") was a limited liability company organized under the laws of the State of Delaware.

35. Metal Centers LLC ("Metal Centers") was a limited liability company organized under the laws of the State of Delaware.

36. RG Steel, LLC ("RG Steel") was a limited liability company organized under the laws of the State of Delaware.

37. RG Steel Warren, LLC ("RG Warren") was a limited liability company organized under the laws of the State of Delaware.

38. RG Steel Railroad Holding, LLC ("RG Railroad") was a limited liability company organized under the laws of the State of Delaware.

39. RG Steel Sparrows Point, LLC ("RG Sparrows Point") was a limited liability company organized under the laws of the State of Delaware.

40. RG Steel Wheeling Steel Group, LLC ("RG Group") was a limited liability company organized under the laws of the State of Delaware.

41. Ira Rennert is an individual who resides in the State of New York.

42. During all relevant periods of time, Ira Rennert has been the Chairman of, and the principal owner of, Renco.

## FACTUAL BACKGROUND

**A. The RG Controlled Group's participation in, and withdrawal from, the Pension Fund and its resulting withdrawal liability assessment**.

43. During all relevant periods of time, RG Wheeling was bound by collective bargaining agreements with local unions affiliated with the IBT under which RG Wheeling was required to make contributions to the Pension Fund on behalf of certain of its employees.

44. From no later than March 1, 2011 through at least August 25, 2012, RG Holdings directly or indirectly owned 100% of the membership interest of RG Wheeling and/or 100% of the profits interest or capital interest in RG Wheeling.

45. From no later than March 1, 2011 through at least August 25, 2012, RG Holdings also directly or indirectly owned 100% of the membership interest of and/or 100% of the profits interest or capital interest in the following limited liability companies:

(a) WP Steel; (b) Metal Centers; (c) RG Steel; (d) RG Warren; (e) RG Railroad; (f) RG Sparrows Point; and (g) RG Group.

46.     From no later than March 1, 2011 through at least August 25, 2012, RG Holdings, RG Wheeling, WP Steel, Metal Centers, RG Steel, RG Warren, RG Railroad, RG Sparrows Point, and RG Group were a group of trades or businesses under common control (the "RG Controlled Group") and therefore constituted a single employer within the meaning of section 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder.

47.     The RG Controlled Group is the "employer" for purposes of the determination and assessment of withdrawal liability under Title IV of ERISA.

48.     The members of the RG Controlled Group were engaged in the business of operating steel mills throughout the United States.

49.     On May 31, 2012, the above referenced members of the RG Controlled Group (i.e., the entities listed in paragraphs 45-46), except for RG Holdings, filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware, which bankruptcy cases were later consolidated and jointly administered under *In re: WP Steel Venture, LLC, et al.*, Case No. 12-11661 (the "WP Bankruptcy"). The WP Bankruptcy cases are identified as follows: (a) WP Steel, case no. 12-11661; (b) RG Steel, case no. 12-11662; (c) Metal Centers, case no. 12-11663; (d) RG Wheeling, case no. 12-11664; (e) RG Warren, case no. 12-11666; (f) RG Railroad, case no. 12-11667; (g) RG Sparrows Point, case no. 12-11668; and (h) RG Group, case no. 12-11669 (the members of the RG Controlled Group that filed for bankruptcy are collectively referred to as the "RG Bankrupt Companies").

50. During the WP Bankruptcy, RG Wheeling permanently ceased operations.

51. As a result of RG Wheeling's cessation of operations, the Pension Fund determined that on or about August 25, 2012, RG Wheeling permanently ceased to have an obligation to contribute to the Pension Fund and/or permanently ceased all covered operations, thereby effecting a "complete withdrawal" from the Pension Fund within the meaning of 29 U.S.C. § 1383.

52. As a result of the complete withdrawal of RG Wheeling, the Pension Fund determined that the RG Controlled Group incurred withdrawal liability to the Pension Fund in the principal amount of $6,336,967.08, as determined under 29 U.S.C. § 1381(b) (the "Withdrawal Liability").

53. On or about January 17, 2013, the RG Controlled Group, through RG Holdings, received a notice and demand for payment of the Withdrawal Liability issued by the Pension Fund in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1). The notice demanded full payment of the entire amount of the Withdrawal Liability by February 1, 2013 pursuant to 29 U.S.C. § 1399(c)(5)(B) and Appendix E, § 5(e)(2) of the Pension Fund's Pension Plan. The amount demanded was $6,336,967.08, the balance owed at that time on the Withdrawal Liability.

54. No member of the RG Controlled Group initiated arbitration pursuant to 29 U.S.C. § 1401(a)(1).

55. The RG Controlled Group failed to make the required Withdrawal Liability payment to the Pension Fund.

56. On June 7, 2013, the Pension Fund filed suit against RG Holdings in the United States District Court for the Northern District of Illinois in a case entitled *Central*

*States, Southeast and Southwest Areas Pension Fund, et al. v. RG Steel Holdings, LLC*, No. 13 C 4255, to collect the Withdrawal Liability, plus interest, statutory damages, attorneys' fees, and costs (the "RG Holdings Lawsuit").

57.     On October 18, 2013, a Consent Judgment was entered in the RG Holdings Lawsuit in favor of the Pension Fund and against RG Holdings in the amount of $7,841,524.96 (the "RG Holdings Judgment").

58.     To date, the full amount of the RG Holdings Judgment remains due and owing to the Pension Fund.

**B.     The makeup of the Renco Controlled Group on August 25, 2012, when the RG Controlled Group incurred the Withdrawal Liability to the Pension Fund.**

59.     Upon information and belief, during all relevant periods of time, Ira Rennert directly or indirectly owned at least 80% of the total combined voting power of all classes of outstanding stock entitled to vote or at least 80% of the total value of outstanding shares of all classes of stock of Renco.

60.     Upon information and belief, Renco owns and operates numerous companies, including without limitation, each of Defendants, Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium.

61.     On or about August 25, 2012, Renco directly or indirectly owned at least 80% of the total combined voting power of all classes of outstanding stock entitled to vote or at least 80% of the total value of outstanding shares of all classes of stock of Blue Turtles.

62.     On or about August 25, 2012, Renco directly or indirectly owned at least 80% of the total combined voting power of all classes of outstanding stock entitled to

vote or at least 80% of the total value of outstanding shares of all classes of stock of Doe Run.

63.     On or about August 25, 2012, Renco directly or indirectly owned at least 80% of the membership interest of Ilshar and/or at least 80% of the profits interest or capital interest in Ilshar.

64.     On or about August 25, 2012, Renco directly or indirectly owned at least 80% of the membership interest of Inteva and/or at least 80% of the profits interest or capital interest in Inteva.

65.     On or about August 25, 2012, Renco directly or indirectly owned at least 80% of the total combined voting power of all classes of outstanding stock entitled to vote or at least 80% of the total value of outstanding shares of all classes of stock of Unarco.

66.     On or about August 25, 2012, Renco directly or indirectly owned at least 80% of the membership interest of US Magnesium and/or at least 80% of the profits interest or capital interest in US Magnesium.

67.     On or about August 25, 2012, Renco, Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium were a group of trades or businesses under common control (the "Renco Controlled Group") and therefore constituted a single employer within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder.

**C.    The members of the Renco Controlled Group and the members of the RG Controlled Group were part of the same controlled group from March 1, 2011 through January 17, 2012.**

68.    Upon information and belief, on or about March 1, 2011 Renco formed RG Holdings, and did so for the purpose of purchasing the RG Bankrupt Companies.

69.    On or about March 1, 2011, Renco, through RG Holdings, purchased 100% of the membership interest and/or the profits interest or capital interest in each of the RG Bankrupt Companies for approximately $945 million (the "Renco Purchase").

70.    From at least March 1, 2011 through January 17, 2012, Renco owned 100% of the membership interest and/or the profits interest or capital interest of RG Holdings.

71.    Thus from March 1, 2011 to January 17, 2012, Renco directly or indirectly owned 100% of the membership interest and/or the profits interest or capital interest of each member of the RG Controlled Group, which consisted of the RG Bankrupt Companies and RG Holdings.

72.    Therefore, from March 1, 2011 to January 17, 2012, all of the members of the Renco Controlled Group and all of the members of the RG Controlled Group were a group of trades or businesses under common control and therefore constituted a single employer within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder.

**D.    The RG Bankrupt Companies worsening financial condition, and Renco's divestiture of a portion of its ownership in such companies.**

73.    Upon information and belief, shortly after the completion of the Renco Purchase, the operations of the RG Bankrupt Companies suffered severe financial

difficulties and incurred operating losses in excess of $195 million during the remainder of 2011.

74.    Upon information and belief, by December 2011, the RG Bankrupt Companies were not able to pay their liabilities and expenses on an ongoing basis, and were insolvent.

75.    Upon information and belief, during the period of July 2011 through December 2011, Renco loaned or contributed to the RG Bankrupt Companies in excess of $100 million.

76.    In December 2011, Renco retained the services of the law firm of Willkie Farr, as bankruptcy counsel for the RG Bankrupt Companies, and Renco began preparations for the filing for bankruptcy protection by the RG Bankrupt Companies.

77.    Also in late 2011 and into early 2012, Renco attempted to obtain up to $200 million in additional financing for the RG Bankrupt Companies.

78.    Then on or about January 17, 2012, Renco transferred 24.5% of its membership interest and/or the profits interest or capital interest in RG Holdings to Cerberus RG Investor LLC ("Cerberus"), and Cerberus loaned the RG Bankrupt Companies in excess of $100 million (the "Cerberus Transaction").

79.    After the Cerberus Transaction, Renco owned 74.5% of the membership interest and/or the profits interest or capital interest of RG Holdings.

80.    However, as a result of, and following the completion of the Cerberus Transaction, Renco (and the members of the Renco Controlled Group) ceased being under common control with the RG Controlled Group within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder because Renco no longer

owned at least 80% of the membership interest and/or profits or capital interest of each such member of the RG Controlled Group.

**E.     Renco had actual notice of the Pension Fund's Withdrawal Liability claim against it pursuant to the RG Holdings Lawsuit and the WP Bankruptcy.**

> **i.     Renco had actual notice of the Pension Fund's Withdrawal Liability claim because it was aware of the RG Holdings Lawsuit**.

81.     Upon information and belief, during all relevant periods of time, Ira Golub was a partner in the law firm of Proskauer Rose LLP ("Proskauer"), and represented Ira Rennert, Renco, and RG Holdings.

82.     Upon information and belief, from February 2003 to May 2014, Joshua Weiss was an attorney with the law firm of Cadwalader, Wickersham & Taft LLP ("Cadwalader"). Upon information and belief, since May 2014 Joshua Weiss has been employed by Renco as its deputy general counsel and vice president.

83.     Upon information and belief, during all relevant periods of time until approximately May 2014, Joshua Weiss represented Ira Rennert, Renco, and RG Holdings. After May 2014, Joshua Weiss still represented Renco and also still had discussions with Pension Fund counsel regarding the Pension Fund's attempt to collect the RG Holdings Judgment, including without limitation, producing documents related to RG Holding's financial inability to satisfy the RG Holdings Judgment referenced in paragraphs 57 and 58 above.

84.     After filing of the RG Holdings Lawsuit as referenced in paragraph 56 above, the Pension Fund obtained service of the summons and complaint on RG Holdings on June 11, 2013.

85.     On or about July 19, 2013, counsel for the Pension Fund (James Condon and Anthony Napoli) had a telephone conference with Ira Golub and Joshua Weiss to discuss the RG Holdings Lawsuit. During this conversation, both Ira Golub and Joshua Weiss informed the Pension Fund that they represented Renco and RG Holdings. During this conversation, Ira Golub and Joshua Weiss requested that the Pension Fund agree to enter into a standstill agreement with Renco and RG Holdings until the completion of a lawsuit filed in January 2013 by the Pension Benefit Guaranty Corporation ("PBGC") against Renco in the United States District Court for the Southern District of New York in a case entitled *Pension Benefit Guaranty Corporation v. The Renco Group, Inc., et al.,* No. 13 C 621, alleging that Renco had attempted to evade or avoid approximately $87 million in pension liabilities (the "PBGC Lawsuit").[1] Ira Golub and Joshua Weiss expressed their belief that the Pension Fund would likely seek to collect the Withdrawal Liability from Renco under circumstances similar to the PBGC Lawsuit, and because they represented that RG Holdings did not have any assets other than its membership interests of the RG Bankrupt Companies.

86.     In a telephone conversation subsequent to the July 19, 2013 telephone conference referenced in paragraph 85 above, on or about August 6, 2013, Pension Fund counsel Anthony Napoli informed Renco and RG Holdings counsel Joshua Weiss that the Pension Fund would not agree to a standstill agreement, and would proceed

---

[1] In this lawsuit, the Pension Fund has named the same Defendants that were named defendants in the PBGC Lawsuit. Further, the Pension Fund alleges substantially the same underlying facts and the same evade and avoid legal theory under ERISA as alleged by the PBGC in the PBGC Lawsuit. On or about January 20, 2016, the PBGC Lawsuit was voluntarily dismissed by the parties pursuant to a settlement entered into between the PBGC and Renco in which the PBGC obtained a successful resolution of the lawsuit obtaining essentially all of the relief it requested against Renco and the Renco Controlled Group in the PBGC Lawsuit.

with the RG Holdings Lawsuit against RG Holdings.

87.     On July 30, 2013, Amanda C. Wiley of Proskauer filed an appearance representing RG Holdings in the RG Holdings Lawsuit.

88.     In September and October 2013, Pension Fund counsel Anthony Napoli and RG Holdings counsel Joshua Weiss negotiated and ultimately agreed to the form and entry of the RG Holdings Judgment. The RG Holdings Judgment referenced in paragraph 57 above was signed by Pension Fund counsel Anthony Napoli and RG Holdings counsel Amanda Wiley.

89.     After entry of the RG Holdings Judgment on October 18, 2013, the Pension Fund commenced a post-judgment investigation and collection efforts with respect to the RG Holdings Judgment. The Pension Fund determined that the RG Holdings Judgment was not collectible against RG Holdings because RG Holdings' only assets were its membership interest and/or the profits interest or capital interest in the RG Bankrupt Companies.

90.     As noted in paragraph 82 above, upon information and belief, in May 2014, RG Holdings counsel Joshua Weiss left the Cadwalader law firm and became the deputy general counsel and vice president at Renco.

91.     By letter dated October 14, 2015, from Pension Fund counsel Anthony Napoli and addressed to Renco counsel Joshua Weiss, the Pension Fund notified Renco and reminded Joshua Weiss that the Pension Fund's Withdrawal Liability assessment against RG Holdings was in the principal amount of $6,336,967.08, and that the RG Holdings Judgment in favor of the Pension Fund and against RG Holdings was in the amount of $7,841,524.96 (the "Renco Letter").

92.     In the Renco Letter, the Pension Fund also notified Renco that the Pension Fund was investigating whether there are any other trades or businesses under common control with RG Holdings within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder, including whether Renco was a member of the controlled group with RG Holdings and liable for the Withdrawal Liability. In the Renco Letter, the Pension Fund further requested that Renco produce certain information and documents related to its membership interest in RG Holdings.

93.     By letter dated January 8, 2015, Renco counsel Joshua Weiss responded to the Renco Letter, and Renco via Joshua Weiss produced to the Pension Fund certain documents related to Renco's membership interest in RG Holdings for the period of March 1, 2011 through January 17, 2012, including documents related to the Cerberus Transaction referenced in paragraph 78 above.

94.     As a result, Renco, via their counsel, received actual notice of the Withdrawal Liability claim against it pursuant to the RG Holdings Lawsuit, the RG Holdings Judgment, and the Renco Letter.

**ii.     Renco had actual knowledge of the Pension Fund's Withdrawal Liability claim against it in the WP Bankruptcy.**

95.     After the commencement of the WP Bankruptcy in 2012 as referenced in paragraph 49 above, nine attorneys entered their appearances on behalf of Renco in the WP Bankruptcy, namely: (a) Karen C. Bifferato of Connolly Bove Lodge Hutz LLP ("Connolly"); (b) Kelly Conlan of Connolly; (c) Christina M. Thompson of Connolly; (d) Mark C. Ellenberg of Cadwalader; (e) Peter M. Friedman of Cadwalader; (f) Jonathan Hoff of Cadwalader; (g) Douglas Mintz of Cadwalader; (h) Sharon J. Richardson of Cadwalader; and (i) Joshua Weiss of Cadwalader (collectively referred to as "Renco

Counsel").

96.     After the commencement of the WP Bankruptcy, four of the attorneys referenced in paragraph 95 above also entered their appearances on behalf of Ira Rennert in the WP Bankruptcy, namely: (a) Karen C. Bifferato of Connolly; (b) Kelly Conlan of Connolly; (c) Jonathan Hoff of Cadwalader; and (d) Joshua Weiss of Cadwalader (collectively referred to as "Rennert Counsel").

97.     After entering their appearances, Renco Counsel and Rennert Counsel received electronic notice via email ("ECF Notice") of all filings in the WP Bankruptcy.

98.     By entering their appearances and receiving ECF notice, Renco Counsel and Rennert Counsel had actual notice of all documents filed in the WP Bankruptcy.

99.     On September 21, 2012, the Pension Fund filed a Proof of Claim asserting a contingent, estimated general unsecured claim for withdrawal liability in the amount of $6,335,976.60 in each of the eight WP Bankruptcy cases, reflecting the fact that each member of the RG Controlled Group was jointly and severally liable for withdrawal liability.

100.    On November 14, 2012, the Pension Fund filed an amended Proof of Claim for the Withdrawal Liability in the amount of $6,336,967.08 in each of the eight WP Bankruptcy cases (the "Pension Fund Amended Proof of Claim"), again reflecting the fact that each member of the RG Controlled Group was jointly and severally liable for the Withdrawal Liability.

101.    On January 11, 2013, the Pension Fund Amended Proof of Claim was identified in a Claims Register that was filed in the WP Bankruptcy, and emailed to all counsel receiving ECF Notice in the WP Bankruptcy. Thereafter, the Pension Fund

Amended Proof of Claim was identified in additional Claims Registers filed in the WP Bankruptcy, and emailed to all ECF Notice recipients, on the following dates: (a) April 8, 2013; (b) July 17, 2013; (c) April 1, 2014; (d) October 1, 2014; (e) April 1, 2015; (f) October 10, 2015; and (g) April 20, 2016.

102.    As a result, Ira Rennert and Renco, via their counsel, received actual notice of the Pension Fund Amended Proof of Claim for the Withdrawal Liability on at least eight separate occasions pursuant to their receipt of the ECF Notices of the Claims Registers filed in the WP Bankruptcy.

**F.    All of the members of the Renco Controlled Group had actual notice of the Pension Fund's Withdrawal Liability claim against it pursuant to the RG Holdings Lawsuit and the WP Bankruptcy.**

103.    In addition to his representation of Rennert, Renco, and RG Holding as referenced in paragraph 83 above, upon information and belief, from at least June 2012 until at least May 2014 Joshua Weiss also represented each of Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium.

104.    Upon information and belief, during all relevant periods of time the Cadwalader law firm represented each of Renco, Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium.

105.    Upon information and belief, during all relevant periods of time the Proskauer law firm represented each of Renco, Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium.

106.    Indeed, in the PBGC Lawsuit referenced in paragraph 85 above, attorneys Bradley Bobroff, David Munkittrick, Joseph Clark, Kevin Perra, and Myron Rumeld of the Proskauer law firm and attorneys Jonathan Hoff and Joshua Weiss of the

Cadwalader law firm entered appearances on behalf of Renco, Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium.

107.    As a result, each of Blue Turtles, Doe Run, Ilshar, Inteva, Unarco, and US Magnesium, via their counsel, received actual notice of the Withdrawal Liability claim against them pursuant to having actual notice of the RG Holdings Lawsuit, the RG Holdings Judgment, and/or of actual notice of the Pension Fund Amended Proof of Claim for the Withdrawal Liability pursuant to their receipt of the ECF Notice of the Claims Registers filed in the WP Bankruptcy.

108.    Further, notice and demand to one member of a controlled group constitutes notice and demand to all members in the controlled group.

109.    Since Renco received actual notice of the Withdrawal Liability, all members of the Renco Controlled Group are deemed to have received actual notice of the Withdrawal Liability.

**G.      The Renco Controlled Group has waived the right to challenge the Withdrawal Liability because it has not initiated arbitration**.

110.    To collect withdrawal liability, a pension plan must first determine the amount of withdrawal liability owed by a withdrawing employer, and the plan must then send the employer a notice and demand for payment of the withdrawal liability. 29 U.S.C. § 1399(b)(1).

111.    The employer may ask the plan to review its withdrawal liability assessment no later than 90 days after the employer receives the notice in 29 U.S.C. § 1399(b)(1). 29 U.S.C. § 1399(b)(2).

112.    If dissatisfied with the review, the employer may initiate arbitration to challenge the withdrawal liability assessment. 29 U.S.C. § 1401(a)(1).

113.    An employer may initiate arbitration within 60 days after the earlier of: (a) the date on which the pension fund responds to the employer's request for review of the assessment, or (b) 120 days after the date of the employer's request for review of the assessment. 29 U.S.C. § 1401(a)(1).

114.    If the employer fails to initiate arbitration, the assessment becomes due and owing and the plan may sue to collect it. 29 U.S.C. § 1401(b)(1); *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. El Paso CGP Co*, 525 F.3d 591, 597 (7th Cir. 2008).

115.    Since the members of the Renco Controlled Group were once under common control with the members of RG Controlled Group (as discussed in paragraphs 69 through 72 above), and because they had notice of the Withdrawal Liability, they remained subject to arbitration requirement. *See El Paso Co.*, 525 F.3d at 598.

116.    Based upon the ECF Notices of the Claims Register that counsel for members of the Renco Controlled Group received in the WP Bankruptcy (as referenced in paragraphs 101 and 107 above), the members of the Renco Controlled Group had actual knowledge of the Pension Fund Proof of Claim and the Withdrawal Liability by no later than January 11, 2013. *El Paso Co.*, 525 F.3d at 600-61. The Pension Fund Amended Proof of Claim contained the amount of the Withdrawal Liability and demanded payment. Under *El Paso Co.*, this information was adequate for purposes of the notice and demand requirement of 29 U.S.C. § 1399(b)(1). *Id.*

117.    The members of the Renco Controlled Group also had actual notice of the Withdrawal Liability claim against them by no later than July 19, 2013 because as discussed in paragraph 85 above in the July 19, 2013 telephone conference Ira Golub

of Proskauer and Joshua Weiss of Cadwalader indicated that they were aware that they had notice of the Complaint filed in the RG Holdings Lawsuit and that they were also aware that the Pension Fund may seek to collect the Withdrawal Liability from Renco. The Complaint filed in the RG Holdings Lawsuit contained the amount of the Withdrawal Liability and demanded payment, and thus this information was adequate for the notice and demand requirement pursuant to 29 U.S.C. § 1399(b)(1) and the Seventh Circuit Court of Appeals ruling in *El Paso CGP Co*, 525 F.3d at 591.

118. Moreover, and as noted in paragraph 106 above, the Proskauer and Cadwalader law firms represented Renco as well as the other members of Renco Controlled Group in the PBGC Lawsuit, which was filed in January 2013.

119. In addition, the Renco Letter in October 2015, referenced in paragraph 91 above, also constituted actual notice of the Withdrawal Liability claim by the Pension Fund against the members of the Renco Controlled Group.

120. The members of the Renco Controlled Group, via their counsel, received actual notice of the Withdrawal Liability claim on at least ten separate occasions as follows: (a) eight times via ECF Notices of the Pension Fund Amended Proof of Claim in the WP Bankruptcy; (b) the RG Holdings Lawsuit; and (c) the Renco Letter, and each such notification constituted actual notice of the Withdrawal Liability sufficient for purposes of 29 U.S.C. § 1399(b)(1).

121. No member of the Renco Controlled Group requested review of the Withdrawal Liability pursuant to 29 U.S.C. § 1399(b)(2).

122. No member of the Renco Controlled Group initiated arbitration pursuant to 29 U.S.C. § 1401(a)(1).

123.    The Renco Controlled Group failed to make the required Withdrawal Liability payment to the Pension Fund.

## CLAIM FOR RELIEF

124.    Plaintiffs hereby reallege and incorporate each and every allegation made in paragraphs 1 through 123 of this Complaint as though fully set forth herein.

125.    Since the Renco Controlled Group received actual notice of the Withdrawal Liability, its statutory duty to request review of the Withdrawal Liability was triggered under 29 U.S.C. § 1399(b)(2)(A), and the Renco Controlled Group was required to request review of the Withdrawal Liability by no later than 90 days after October 14, 2015, at the latest, when Renco counsel received the Renco Letter.

126.    Similarly, since the Renco Controlled Group received actual notice of the Withdrawal Liability, its statutory duty to arbitrate and disputes concerning the Withdrawal Liability was also triggered under 29 U.S.C. § 1401(a)(1).

127.    However, the members of the Renco Controlled Group did not timely request review of the Withdrawal Liability pursuant to 29 U.S.C. § 1399(b)(2).

128.    The members of the Renco Controlled Group also did not timely initiate arbitration pursuant to 29 U.S.C. § 1401(a)(1).

129.    Moreover, Ira Rennert and Renco knew that the transfer by Renco of 24.5% of its membership interest and/or the profits interest or capital interest of RG Holdings to Cerberus would have the effect of removing the members of the Renco Controlled Group from the RG Controlled Group, thus seemingly insulating the members of the Renco Controlled Group from the obligation to pay the Withdrawal Liability.

130.    A principal purpose of Renco entering into the Cerberus Transaction was

to evade or avoid the Withdrawal Liability owed by the Renco Controlled Group (as members of the RG Controlled Group) to the Pension Fund.

131.    29 U.S.C. § 1392(c) prohibits a transaction if a principal purpose of such transaction is to evade or avoid the payment of withdrawal liability.

132.    Pursuant to 29 U.S.C. § 1392(c), the Cerberus Transaction and Renco's divestiture of 24.5% of its ownership interest in RG Holdings is to be disregarded in determining and collecting the Withdrawal Liability owed by the RG Controlled Group, including the members of the Renco Controlled Group.

133.    Therefore, on or about August 25, 2012, the members of the Renco Controlled Group, including each of the Defendants, were trades or businesses under common control with the RG Controlled Group within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder, and consequently jointly and severally liable for the Withdrawal Liability.

WHEREFORE, Plaintiffs request the following relief:

(a)    A judgment against all Defendants, and on behalf of Plaintiffs, pursuant to 29 U.S.C. §§ 1132(g)(2) and 1451(b), for --

(i)    $6,336,967.08 in withdrawal liability;

(ii)    interest computed and charged at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA for the fifteenth (15th) day of the month for which interest is charged;

(iii)    an amount equal to the greater of interest on the past due withdrawal liability or liquidated damages of 20% of the past due withdrawal liability; and

(iv)    attorneys' fees and costs.

(b)     Post-judgment interest computed and charged on the entire judgment at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA for the fifteenth (15th) day of the month for which interest is charged, compounded annually; and

(c)     For such further or different relief as this Court may deem proper and just.

Respectfully submitted,

/s/ Anthony E. Napoli
Anthony E. Napoli
Attorney for Plaintiffs
Central States Funds
9377 W. Higgins Road, 10th Floor
Rosemont, Illinois 60018-4938
(847) 939-2469
ARDC # 06210910
March 13, 2018                                    tnapoli@centralstates.org